## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

**RAMIRO BELTRAN** *et al.*

     **Plaintiff,**

             **CASE NO. 13-cv-1043**

 **v.**

**MAXFIELD LLC,** *et al.*

     **Defendants.**

## DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND DEFENDANTS' PROPOSED FINDINGS OF FACT

1. Defendant Gus (Konstantinos) Zarmakoupis is the owner/manager of Maxfield's and is responsible for the day-to-day operations of the restaurant including: singing checks on behalf of Maxfield's, hiring bussers, cooks, and dishwasher; firing bussers, cooks and dishwashers; and setting the schedule for bussers, cooks, and dishwashers (Deposition Transcript of FED. R.CIV.P. 30(B)(6) Designee Gus (Konstantinos) Zarmakoupis ("Zarmakoupis Dep.", ECF No. 28-4, at 15:7, 16:5-20, 21:2-12.)

 RESPONSE: No dispute.

2. Since the inception of Maxfield's, Zarmakoupis has decided both the rate of pay for the bussers, cooks, and dishwashers as well as how the bussers, cooks, dishwashers would be paid (salary or hourly). (Zarmakoupis Dep., ECF No. 28-4, at 21:22-22:14.)

 RESPONSE: No dispute.

1

3.     Since the inception of Maxfield's, Zarmakoupis has determined whether Maxfield's would pay its bussers, cooks, and dishwashers overtime compensation or not. (Zarmakoupis Dep., ECF No. 28-4, at 23:7-9.)

RESPONSE: No dispute that Zarmakoupis determined Maxfield's employees' compensation.

4.     Since the inception of Maxfield's Zarmakoupis processed payroll for Maxfield's employees. (Zarmakoupis Dep., ECF No. 28-4, at 23:10-15.)

RESPONSE: No dispute.

5.     Maxfield's has a time keeping policy under which the cooks, dishwashers, and bussers are to punch in upon arrival and punch out prior to leaving. (Zarmakoupis Dep., ECF No. 28-4, at 45:1-20.)

RESPONSE: No dispute.

6.     Maxfield's employees recorded their hours worked on timecards since September 2010. (Zarmakoupis Dep., ECF No. 28-4, at 45: 1-20, 47: 21-48:1.)

RESPONSE: Zarmakoupis testified that this was the required procedure since September 2010. (Zarmakoupis Dep., ECF No. 28-4, at 45: 1-20, 47: 21-48:1.)

7.     Maxfield's no longer has the timecards for the time period from September 2010 through November 2013. (Zarmakoupis Dep., ECF No. 28-4, at 45:1-20, 47: 21-48:1.)

RESPONSE: No dispute.

8.     On two occasions, Maxfield's threw away its employees timecards. (Zarmakoupis Dep., ECF No. 28-4, at 48:12-18.)

RESPONSE: No dispute that those time cards were disposed of. Dispute that "Maxfield's" did so, as no employee accepts responsibility for disposing of the time cards and it is possible that one of the Plaintiffs did so. (Zarmakoupis Dep., ECF No. 28-4, at 56:10-12; 32:14.)

9.    In 2010, the fire department required Maxfield's to clear out an area of the restaurant which was deemed a fire hazard and Maxfield's threw the dishwashers', bussers', and cooks' timecards out amongst other garbage. (Zarmakoupis Dep., ECF No. 28-4, at 48:2-49:10.)

RESPONSE: No dispute that the fire department required Maxfield's to clear out an area of the restaurant. Dispute that "Maxfield's" did so, as no employee accepts responsibility for disposing of the time cards and it is possible that one of the Plaintiffs did so. (Zarmakoupis Dep., ECF No. 28-4, at 56:10-12; 32:14.)

10.    The second time Maxfield's threw its employees' timecards into the garbage was in late November 2013. (Zarmakoupis Dep., ECF No. 28-4, at 54:3-4.)

RESPONSE: No dispute that time cards were disposed of in or around late November, 2013. Dispute that "Maxfield's" did so, as no employee accepts responsibility for disposing of the time cards and it is possible that one of the Plaintiffs did so. (Zarmakoupis Dep., ECF No. 28-4, at 56:10-12; 32:14.)

11.    Maxfield's kept the timecards in a black garbage bag – the same type of black garbage bag Maxfield's uses for the restaurant's garbage.   (Zarmakoupis Dep., ECF No. 28-4, at 49:11-19, 54:9-13, 55:20-56:3, 56:13-57:3, 18:1-8.)

3

RESPONSE: No dispute.

12.     When the timecards were thrown out, Maxfield's was aware of this lawsuit. (Zarmakoupis Dep., ECF No. 28-4, at 57:4-6, 58:4-12.)

RESPONSE:   No dispute that Maxfield's was aware of this lawsuit when the time cards were disposed of in November, 2013. However, this lawsuit was served on Defendants on or around September 17, 2013. (ECF No. 6). The first set of time cards were disposed of in 2010, three years prior to this lawsuit.

13.     When the timecards were thrown out, Maxfield's was aware that this lawsuit was about unpaid wages. (Zarmakoupis Dep., ECF No. 28-4, at 57:4-6, 58:4 - 12.)

RESPONSE: No dispute that Maxfield's was aware of the complaints made in this lawsuit when the time cards were disposed of in November, 2013. However, this lawsuit was served on Defendants on or around September 17, 2013. (ECF No. 6). The first set of time cards were disposed of in 2010, three years prior to this lawsuit.

14.     When the timecards were thrown out, Maxfield's knew that the time cards were valuable evidence in this lawsuit. (Zarmakoupis Dep., ECF No. 28-  4, at 57:4-6, 58:4-12.)

RESPONSE: No dispute that Maxfield's was aware that time cards could serve as evidence when the time cards were disposed of in November, 2013. However, this lawsuit was served on Defendants on or around September 17, 2013. (ECF No. 6). The first set of time cards were disposed of in 2010, three years prior to this lawsuit. Also, "valuable evidence" is a legal conclusion and the relied-on testimony is from a lay witness.

15.     Maxfield's threw out the timecards and did not maintain a copy of the timecards.

(Zarmakoupis Dep., ECF No. 28-4, at 57:4-6, 58:4-12.)

RESPONSE: No dispute that no copy of the time cards was maintained. Dispute that "Maxfield's" disposed of them, as no employee accepts responsibility for disposing of the time cards and it is possible that one of the Plaintiffs did so. (56:10-12; 32:14.)

16.   Prior to November 2013, when Zarmakoupis was doing payroll each Monday morning, the timecards would be on Zarmakoupis' desk. ((Zarmakoupis Dep., ECF No. 28-4, at 58:24-60:9.)

RESPONSE: No dispute.

17.   Prior to November 2013, when Zarmakoupis was doing payroll, Zarmakoupis testified he totaled all the daily hours for each employee and wrote that number on each employees' timecards. (Zarmakoupis Dep., ECF No. 28-4, at 58:24-60:9.)

RESPONSE: No dispute that Zarmakoupis testified that prior to November 2013, he performed payroll functions as stated. However, to the extent that this proposed finding can be read that Zarmakoupis testified prior to November 2013, that is incorrect. Mr. Zarmakoupis testified on January 3, 2014.   (Zarmakoupis Dep., ECF No. 28-4, at 1.)

18.   Prior to November 2013, when Zarmakoupis was doing payroll, he would not differentiate between regular and overtime hours when adding up Plaintiffs' hours worked and writing that number on the timecards. (Zarmakoupis Dep., ECF No.28-4, at 70:8.)

RESPONSE: No dispute.

19.   Prior to November 2013, when Zarmakoupis was doing payroll, he would write the total number of hours worked each week on the timecards. (Zarmakoupis Dep., ECF No.

5

28-4, at 85:2-4.)

RESPONSE: No dispute.

20. Prior to November 2013, when Zarmakoupis was doing payroll, Zarmakoupis testified that he would multiply the number of hours worked as recorded on each timecard, by each employees' hourly rate, to determine the amount of cash to pay the bussers and the dishwashers. (Zarmakoupis Dep., ECF No. 28-4, at 88:18-23.)

RESPONSE: No dispute that Zarmakoupis testified that prior to November 2013, he performed payroll functions as stated. However, to the extent that this proposed finding can be read that Zarmakoupis testified prior to November 2013, that is incorrect. Mr. Zarmakoupis testified on January 3, 2014. (Zarmakoupis Dep., ECF No. 28-4, at 1.)

21. Prior to November 2013, Maxfield's dishwashers and bussers were all paid only in cash. (Zarmakoupis Dep., ECF No. 28-4, at 65:20-66:12.)

RESPONSE: No dispute.

22. Prior to November 2013, Maxfield's paid Perez in only cash. (66:25-68:5.)

RESPONSE: No dispute.

23. Prior to November 2013, Maxfield's paid Rivas in part cash and part paycheck. (Zarmakoupis Dep., ECF No. 28-4, at 61:1-13, 69:14-69)

RESPONSE: No dispute.

24. Zarmakoupis testified that Maxfield's dishwashers and bussers were paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 67:11-15, 71:2-11.)

RESPONSE: No dispute.

6

25.     Zarmakoupis testified that prior to September 13, 2013, Maxfield's paid its bussers and dishwashers including Opt-In Plaintiffs A. Alvarez, M. Alvarez, Coto, Manuel, Mazaba, Sosa, and Santiago, $7.00 per hour. (Zarmakoupis Dep., ECF No. 28-4, at 88:4-7.)

RESPONSE: No dispute.

26.     Zarmakoupis testified that Beltran, also a busser, was paid $7.00 per hour from the beginning of his employment until the week of May 21, 2012 when he received a raise to $8.25 per hour. (Zarmakoupis Dep., ECF No. 28-4, at 121:12-19.)

RESPONSE: No dispute.

27.     Ramiro Beltran was paid $280 per week for all hours worked within that week. (Beltran Decl., ECF No. 39, ¶ 6.)

RESPONSE: Dispute. Ramiro Beltran's weekly take-home pay varied based on the number of hours worked, and in no week was he paid $280.     (Zarmakoupis Dep., ECF No. 28-4, at 121:12-19; Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 4-5.)

28.     Ramiro Beltran was scheduled to work for 60 hours a week and generally worked all his scheduled hours. (Beltran Decl., ECF No. 39, ¶ 5.)

RESPONSE: Dispute. Beltran worked varying numbers of hours per week, usually significantly less than 60. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 4-5.)

29.     Ramiro Beltran's regular rate, hours worked divided by weekly pay, was $4.67. (Beltran Decl., ECF No. 39, ¶¶ 5-6.)

RESPONSE:   Dispute. Beltran's regular rate of take-home pay was $7.00 from August 22, 2011 until May 21, 2012, and $8.25 per hour thereafter. (Zarmakoupis Dep., ECF

No. 28-4, at 121:12-19.)

30.     Mauricio Coto was paid $280 per week for all hours worked within that week. (Coto Decl., ECF No. 45, ¶ 6.)

RESPONSE: Dispute. Coto was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 73:18-19.)

31.     Mauricio Coto was scheduled for 50 hours a week and generally worked all his scheduled hours. (Coto Decl., ECF No. 45, ¶ 5.)

RESPONSE: Dispute. Coto's hours varied, and he primarily worked less than 40 hours per week. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 1.)

32.     Mauricio Coto's regular rate, hours worked divided by weekly pay, was $5.60. (Coto Decl., ECF No. 45, ¶¶ 5, 6.)

RESPONSE: Dispute. Coto's regular take-home rate was $7.00.    (Zarmakoupis Dep., ECF No. 28-4, at 73:18-19.)

33.     Francisco Perez was paid $470 per week for all hours worked within that week. (Perez Decl., ECF No. 40, ¶ 7.)

RESPONSE: Dispute. Although Perez requested to be paid a flat rate for 50 hours of work per week, Perez was paid varying amounts per week based on hours worked. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 13-14.)

34.     Francisco Perez was scheduled for 54 hours a week and generally worked all his scheduled hours. (Perez Decl., ECF No. 40, ¶ 5.)

RESPONSE: Dispute. Perez worked varying hours each week, generally under 50.

8

(Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 13-14.)

35.    Francisco Perez's regular rate, hours worked divided by weekly pay,  was $8.70. (Perez Decl., ECF No. 40, ¶¶ 5-6.)

RESPONSE: For the purpose of this motion, Defendants will not dispute this proposed fact.

36.    Daniel Santiago was paid $280 per week for all hours worked within  that week. (Santiago Decl., ECF No. 41, ¶ 6.)

RESPONSE: Dispute. Santiago was paid an hourly rate. (Zarmakoupis Decl. ¶ 8.)

37.    Daniel Santiago was scheduled for 48 hours a week and generally  worked all his scheduled hours. (Santiago Decl., ECF No. 41, ¶ 5.)

RESPONSE: Dispute. Santiago worked varying numbers of hours per week, and generally fewer than 40. (Zarmakoupis Dec;. ¶ 9; Ex. A.)

38.    Daniel Santiago's regular rate, hours worked divided by weekly pay,  was $5.83. (Santiago Decl., ECF No. 41, ¶¶ 5, 6.)

RESPONSE: Dispute. Santiago's regular rate of take-home pay was $7.00 per hour. (Zarmakoupis Decl. ¶ 8.)

39.    Alfredo Alvarez was paid $300 per week for all hours worked within  that week. (A. Alvarez Decl., ECF No. 42, ¶ 6.)

RESPONSE: Dispute. Alvarez was paid an hourly rate. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at

2-3; Zarmakoupis Dep., ECF No. 28-4, at 74:24-75:9.)

9

40.     Alfredo Alvarez was scheduled for 54 hours a week and generally  worked all his scheduled hours. (A. Alvarez Decl., ECF No. 42, ¶ 5.)

RESPONSE: Dispute. Alvarez worked approximately 50 hours each week, with some variation. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 2-3.)

41.     Alfredo Alvarez's regular rate, hours worked divided by weekly pay,  was $5.56. (A. Alvarez Decl., ECF No. 42, ¶¶ 5, 6.)

RESPONSE: Dispute. Alfredo Alvarez's regular rate of take-home pay was $7.00 per hour.( Zarmakoupis Dep., ECF No. 28-4, at 74:24-75:9.)

42.     Margarito Morales Rivas was paid $550 per week for all hours worked  within that week. (Rivas Decl., ECF No. 48, ¶ 6.)

RESPONSE: Dispute. Morales Rivas was paid an hourly wage and overtime. (Zarmakoupis Dep., ECF No. 28-4, at 61:22-62:19.)

43.     Margarito Morales Rivas was scheduled for 60 hours a week and  generally worked all his scheduled hours. (Rivas Decl., ECF No. 48, ¶ 5.)

RESPONSE: Dispute. While Morales Rivas typically worked approximately 60 hours per week, his weekly hours varied on occasion. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at10-12.)

44.     Margarito Morales Rivas's regular rate, hours worked divided by  weekly pay, was $9.17. (Rivas Decl., ECF No. 48, ¶¶ 5, 6.)

RESPONSE: Margarito Morales Rivas' regular rate was $8.75 per hour. (Zarmakoupis Dep., ECF No. 28-4, at 62:1.)

45.     Erick Manuel was paid $280 per week for all hours worked within that  week. (Manuel Decl., ECF No. 44, ¶ 6.)

RESPONSE: Dispute. Manuel was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 74:1-8.)

46.     Erick Manuel was scheduled for 51 hours a week and generally worked  all his scheduled hours. (Manuel Decl., ECF No. 44, ¶ 5.)

RESPONSE: Dispute. Manuel worked varying numbers of hours each week, most commonly between 42.5 and 44. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 9.)

47.     Erick Manuel's regular rate, hours worked divided by weekly pay, was

$5.49. (Manuel Decl., ECF No. 44, ¶¶ 5, 6.)

RESPONSE: Dispute. Manuel's regular rate of take-home pay was $7.00 per hour. (Zarmakoupis Dep., ECF No. 28-4, at 74:1-8.)

48.     Miguel Mazaba was paid $280 per week for all hours worked within  that week. (Mazaba Decl., ECF No. 47, ¶ 6.)

RESPONSE: Dispute. Mazaba was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 73:9-12.)

49.     Miguel Mazaba was scheduled for 60 hours a week and generally  worked all his scheduled hours. (Mazaba Decl., ECF No. 47, ¶ 5.)

RESPONSE: Dispute. Mazaba worked varying numbers of hours each week. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 15.)

50.     Miguel Mazaba's regular rate, hours worked divided by weekly pay,  was

$4.67. (Mazaba Decl., ECF No. 47, ¶¶ 5, 6.)

RESPONSE: Dispute. Mazaba's regular rate of take-home pay was $7.00. (Zarmakoupis Dep., ECF No. 28-4, at 73:11-12.)

51.  Miguel Alvarez was paid $280 per week for all hours worked within that week. (M. Alvarez Decl., ECF No. 43, ¶¶ 6.)

RESPONSE: Dispute. Alvarez was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 122:7-8.)

52.  Miguel Alvarez was scheduled for 54 hours a week and generally worked all his scheduled hours. (M. Alvarez Decl., ECF No. 43, ¶ 5.)

RESPONSE: No dispute that Miguel Alvarez worked 54 hours in most weeks; however, there was some variation. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 6-7.)

53.  Miguel Alvarez's regular rate, hours worked divided by weekly pay, was $5.19. (M. Alvarez Decl., ECF No. 43, ¶¶ 5, 6.)

RESPONSE: Dispute. Miguel Alvarez's regular take-home rate was $7.00 per hour. (Zarmakoupis Dep., ECF No. 28-4, at 122:7-8.)

54.  Agueda Sosa was paid $280 per week for all hours worked within that week. (Sosa Decl., ECF No. 46, ¶ 6.)

RESPONSE: Dispute. Agueda Sosa was paid an hourly wage. (Zarmakoupis Decl. ¶ 3, 8.)

55.  Agueda Sosa was scheduled for 54 hours a week and generally worked all his scheduled hours. (Sosa Decl., ECF No. 46, ¶ 5.)

12

RESPONSE: Dispute. Agueda Sosa worked approximately 50 hours most weeks, with some variation. ((Zarmakoupis Decl. ¶ 10.) Also affirmatively state that Agueda Sosa is female.

56.     Agueda Sosa's regular rate, hours worked divided by weekly pay, was $5.19. (Sosa Decl., ECF No. 46, ¶¶ 5, 6.)

RESPONSE: Dispute. Agueda Sosa's regular take-home rate was $7.00 per hour. (Zarmakoupis Decl. ¶   8.)

57.     Prior to late November 2013, Maxfield's did not pay its dishwashers,  nor its bussers, overtime premium compensation when they worked more that forty hours in a workweek. (Zarmakoupis Dep., ECF No. 28-4, at 74:21-24, 75:20-76:5,  101:11-15, 103:18-104:6.)

RESPONSE: No dispute.

58.     Zarmakoupis testified that Maxfield's paid its bussers and  dishwashers the same hourly rate for hours over forty and hours under forty.  (Zarmakoupis Dep., ECF No. 28-4, at 101:11-15.)

RESPONSE: No dispute.

59.     Prior to late November 2013, Maxfield's paid its cooks, including Rivas  and Perez a flat rate per week for the scheduled hours. (Zarmakoupis Dep., ECF No.  28-4, at 80:22-82:6.)

RESPONSE: Dispute. Maxfield's paid Rivas an hourly rate and overtime, and Zarmakoupis testified he would adjust both cooks' compensation based on the number of

13

hours worked.    (Zarmakoupis Dep., ECF No. 28-4, at 80:22-82:6; Zarmakoupis Dep. Ex. 7, ECF No.  28-5, at p. 10-14.)

60.    When a cook worked more than scheduled, Zarmakoupis testified that Maxfield's would add additional compensation to the flat rate per week in the  amount of their average hourly rate multiplied by the additional hours worked.  (Zarmakoupis Dep., ECF No. 28-4, at 80:22-82:6; Zarmakoupis Dep. Ex. 7, ECF No.  28-5, at p. 10-14.)

RESPONSE: No dispute that Maxfield's would add compensation when cooks worked additional hours.

61.    Similarly, when a cook worked less than scheduled, Zarmakoupis  testified that Maxfield's would deduct from the flat weekly rate per week an amount  equal to the average hourly rate multiplied by the scheduled hours not worked.  (Zarmakoupis Dep., ECF No. 28-4 at 80:22-82:6; Zarmakoupis Dep. Ex. 7, ECF No.  28-5, at p. 10-14.)

RESPONSE: No dispute that Maxfield's would subtract compensation when cooks did not work all scheduled hours.

62.    Zarmakoupis testified that the average hourly rate for the cooks was determined by the flat weekly rate divided by the scheduled number of hours in  that week. (Zarmakoupis Dep., ECF No. 28-4, at 80:22-82:6; Zarmakoupis Dep. Ex.  7, ECF No. 28-5, at p. 10-14.)

RESPONSE: No dispute that Zarmakoupis testified that he would determine the average hourly rate for the purpose of adding or subtracting compensation by performing the calculation as stated.

63.     Zarmakoupis testified that if a cook worked less than forty hours, Maxfield's would still deduct from the flat weekly rate per week an amount equal to the average hourly rate multiplied by the scheduled hours not worked, including those hours under forty. (Zarmakoupis Dep., ECF No. 28-4, at 80:22-82:6; Zarmakoupis Dep. Ex. 7, ECF No. 28-5, at p. 10-14.)

RESPONSE: No dispute.

64.     Maxfield's did not withhold taxes from the compensation paid to the bussers, cooks, and dishwashers that Maxfield's paid in cash. (Zarmakoupis Dep., ECF No. 28-4, at 100:23-101-:4.).

RESPONSE: No dispute that Zarmakoupis testified as stated.

65.     Maxfield's did not contact the Department of Labor to determine if its compensation practices were legal. (Zarmakoupis Dep., ECF No. 28-4, at 156:1-19.)

RESPONSE: No dispute.

66.     Maxfield's did not obtain an opinion letter from the Department of Labor with regard to Maxfield's compensation practices. (Zarmakoupis Dep., ECF No. 28-4, at 160:6-12.)

RESPONSE: No dispute.

67.     Maxfield's did not rely on any administrative regulations in determining whether its compensation practices were legal. (Zarmakoupis Dep., ECF No. 28-4, at 160-23-161:2.)

RESPONSE: No dispute.

68. Maxfield's did not rely on an administrative order from the Department of Labor in determining if its compensation practices were legal. (Zarmakoupis Dep., ECF No. 28-4, at 161:15-19.)

RESPONSE: No dispute.

69. Maxfield's did not obtain the approval of the Department of Labor in determining whether its compensation practices were legal. (Zarmakoupis Dep., ECF No. 28-4, at 161:24-162:2.)

RESPONSE: No dispute.

70. Maxfield's did not rely on an interpretation of the Department of Labor in determining whether its compensation practices were legal. (Zarmakoupis Dep., ECF No. 28-4, at 162:3-7.)

RESPONSE: No dispute.

71. Zarmakoupis did not do anything to determine whether its compensation practices were legal. (Zarmakoupis Dep., ECF No. 28-4, at 162:23- 163:12.)

RESPONSE: No dispute that Zarmakoupis testified as stated.

72. Maxfield's did not look at either the FLSA or Wisconsin law to determine that it could pay less than minimum wage; nor did Maxfield's talk to anyone or do any research to determine if Maxfield's could pay less than minimum wage. (Zarmakoupis Dep., ECF No. 28-4, at 164:25-165:9.)

RESPONSE: No dispute that Zarmakoupis testified as stated.

73. Since September 2010, Maxfield's knew that minimum wage was $7.25.

16

(Zarmakoupis Dep., ECF No. 28-4, at 163:20-21; 178:3-10.)

RESPONSE: Maxfield's knew that the minimum wage by check was $7.25.

(Zarmakoupis Dep.,ECF No. 28-4, at 164:14.)

74.     Since September 2010, Maxfield's knew that $7.00 is less than $7.25.

(Zarmakoupis Dep., ECF No. 28-4, at 164:22-24.)

RESPONSE: While Zarmakoupis testified that he was aware that $7.00 is less than

$7.25, he also testified that "$7.00 in cash and $7.25 in check are not the same." (Zarmakoupis

Dep., ECF No. 28-4 at 164:14; see also 178:24-25).

75.     Since September 2010, Maxfield's knew that $7.00 is less than  minimum

wage. (Zarmakoupis Dep., ECF No. 28-4, at 163:13-164:4, 164:22-24,  178:3-10.)

RESPONSE:    Maxfield's knew that $7.00 take-home in cash was greater than

minimum wage in check. (Zarmakoupis Dep., ECF No. 28-4,at 178:24-25.)

76.     Since September 2010, Maxfield's knew that Maxfield's was paying its

bussers and dishwashers $7.00 per hour. (Zarmakoupis Dep., ECF No. 28-4, at  164:2-4.)

RESPONSE: Maxfield's knew that Maxfield's was paying its bussers and dishwashers

a take-home wage of $7.00 per hour. (See Zarmakoupis Dep., ECF No. 28-4, at  164:2-4.)

77.     September 2010, Maxfield's knew that the FLSA required it to  pay its

employees overtime. (Zarmakoupis Dep., ECF No. 28-4, at 176:3-9; 178:11-  20.)

RESPONSE: Zarmakoupis testified that he "kind of sort of" knew what FLSA was.

(Zarmakoupis Dep., ECF No. 28-4, at 176:3-9.)

78.     Since September 2010, Maxfield's was aware of the number of hours  worked

17

by its employees, including those over forty in a workweek. (Zarmakoupis  Dep., ECF No. 28-4, at 179:1-13; Zarmakoupis Dep. Ex. 7, ECF No. 28-5, at p. 1-15.)

RESPONSE: No dispute.

79.    Maxfield's took no actions at all to make sure that it was in compliance  with the FLSA. (Zarmakoupis Dep., ECF No. 28-4, at 176:10-14.)

RESPONSE: No dispute.

80.    Zarmakoupis testified that Perez was paid $450 a week for a scheduled  50 hours of work. (Zarmakoupis Dep., ECF No. 28-4, at 77:12-24.)

81.    RESPONSE: Zarmakoupis testified that Perez requested $450 a week for 50 hours of work. (Zarmakoupis Dep., ECF No. 28-4, at 76:12-13.)

82.    Zarmakoupis testified that when Perez worked less than fifty hours,  Maxfield's would deduct $9.00 per hour from his weekly salary. (Zarmakoupis Dep.,  ECF No. 28-4, at 78:7-11.)

RESPONSE: Dispute that the requested $450 per week was a "weekly salary." No dispute that Maxfield's would adjust Perez's compensation by $9.00 per hour.

83.    Zarmakoupis testified that when Perez worked less than forty hours, Maxfield's would still use the same $9.00 per hour rate to deduct from his weekly  salary. (Zarmakoupis Dep., ECF No. 28-4, at 79:23-80:3.)

RESPONSE: No dispute.

84.    Zarmakoupis testified that Maxfield's would break the weekly flat rate  down into an hourly rate and increase or decrease the weekly salary that hourly  rate. (Zarmakoupis

18

Dep., ECF No. 28-4, at 80:22-82:6.)

RESPONSE: No dispute.

85.     Agueda Sosa worked for Maxfield's as a busser. (Sosa Decl., ECF No. 46, ¶ 2; Zarmakoupis Dep., ECF No. 28-4, at 31:18-9.)

RESPONSE: No dispute.

86.     Agueda Sosa worked for Maxfield's as a busser from 2009 through September 12, 2011. (Sosa Decl., ECF No. 46, ¶ 3.)

RESPONSE: Agueda Sosa worked until approximately May 30, 2011. (Zarmakoupis Decl. ¶ 6.)

87.     Agueda Sosa was hired by Maxfield's back of house manager, Enrique. (Sosa Decl., ECF No. 46, ¶ 2.)

RESPONSE: It is unknown whether Sosa was hired by Enrique; however, it is immaterial to this motion.

88.     Agueda Sosa's duties included clearing tables, cleaning tables, setting tables, bringing water and coffee, cleaning restrooms, and cleaning carpet. (Sosa Decl., ECF No. 46, ¶ 4.)

RESPONSE: No dispute.

89.     Agueda Sosa's work schedule was from 7 a.m. to 4 p.m. on Mondays, Wednesdays, Thursday, Fridays, Saturdays, and Sundays. (Sosa Decl., ECF No. 46, ¶ 5.)

RESPONSE: Dispute. Although Agueda Sosa's exact work schedule is not available, other records indicate she worked approximately 50 hours per week, which is fewer hours

than this schedule suggests. (Zarmakoupis Decl. ¶ 10.)

## **DEFENDANTS' STATEMENT OF ADDITIONAL FACTS**

1.     Bussers and dishwashers other than Beltran were paid a take-home wage of $7.00 per hour in cash, which was intended to be equal to or greater than minimum wage after withholding.

2.     Daniel Santiago worked as a busser for Maxfield's LLC from approximately August 20, 2012 to February 18, 2013.

3.     Agueda Sosa is listed as "Angela" or "Angie" in Maxfield's payroll records.

4.     Sosa worked for Maxfield's LLC from prior to September 17, 2010 (the statute of limitations applicable to her) until approximately May 30, 2011.

5.     In all but four workweeks, Santiago worked 40 hours or less.

6.     Sosa worked approximately 50 hours most weeks, with some variations from week to week.

7.     Cooks, busboys, and dishwashers do not punch in and out for breaks, including duty-free meal breaks lasting 30 minutes or more. They have received compensation for time that is not spent performing work.

8.     Additionally, as part of their compensation, cooks, busboys, and dishwashers including all Plaintiffs were permitted to eat food from the restaurant kitchen without a deduction from their take-home pay. Depending on when the employees were scheduled, they could eat two meals a day (breakfast and lunch), as well as drink unlimited beverages without

20

charge.

9. Ramiro Beltran's weekly take-home pay varied based on the number of hours worked, and in no week was he paid $280. (Zarmakoupis Dep., ECF No. 28-4, at 121:12-19; Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 4-5.)

10. Beltran worked varying numbers of hours per week, usually significantly less than 60. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 4-5.)

11. Mauricio Coto was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 73:18-19.)

12. Coto's hours varied, and he primarily worked less than 40 hours per week. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 1.)

13. Francisco Perez requested to be paid $450 for 50 hours of work per week. However, Perez was paid varying amounts per week based on an hourly rate for hours worked. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 13-14.)

14. Perez worked varying hours each week, generally under 50. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5, at 13-14.)

15. Alfredo Alvarez was paid an hourly rate. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 2-3; Zarmakoupis Dep., ECF No. 28-4, at 74:24-75:9.)

16. Alfredo Alvarez worked approximately 50 hours each week, with some variation. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 2-3.)

17. Margarito Morales Rivas was paid an hourly wage and overtime. (Zarmakoupis Dep., ECF No. 28-4, at 61:22-62:19.)

18.    While Rivas typically worked approximately 60 hours per week, his weekly hours varied on occasion. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at10-12.)

**19.**    Rivas' regular rate was $8.75 per hour, and he received 40 hours of regular pay, or $350, by paycheck. (Zarmakoupis Dep., ECF No. 28-4, at 62:1-21.)

**20.**    Rivas received overtime compensation in cash. The amount of overtime varied from week to week but worked out to at least $13.13 per hour, or time-and-a-half based on a regular rate of $8.75. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at10-12; Zarmakoupis Dep. ,ECF No. 28-4 at 62:17-24.)

**21.**    Erick Manuel was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 74:1-8.)

22.    Manuel worked varying numbers of hours each week, most commonly between 42.5 and 44. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 9.)

**23.**    Miguel Mazaba was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 73:9-12.)

**24.**    Mazaba worked varying numbers of hours each week. (Ex. 7 to Zarmakoupis Dep., ECF No. 28-5 at 15.)

25.    Miguel Alvarez was paid an hourly rate. (Zarmakoupis Dep., ECF No. 28-4, at 122:7-8.)

26.    The weekly payroll records of Maxfield's LLC are contained in a black notebook maintained in the ordinary course of business. (Zarmakoupis Dep. ECF No. 28-4, at 85:1-2; 89:6-7; Zarmakoupis Decl. ¶ 2.)

22

27.     Weekly hours worked by each employee can be easily determined by dividing the amount of pay by the hourly wage received. (Zarmakoupis Dep. ECF No. 28-4, at 119:16-19, 124:19-21; 131:18-24; *generally* Ex. 7 to Zarmakoupis Dep., ECF No. 28-5.)

28.     If the Plaintiffs receiving $7.00 per hour in take-home pay had been paid by check, they would have taken home roughly $6.70 per hour after withholding. (Zarmakoupis Dep. ECF No. 28-4, at 163:15-19.)

Dated this 22nd day of October, 2014.

**GUTGLASS, ERICKSON, BONVILLE & LARSON, S.C.**

By:     /s/ Stacie H. Rosenzweig_____
         Paul R Erickson, SBN 1003920
         paul.erickson@gebsc.com
         Stacie H. Rosenzweig, SBN 1062123
         stacie.rosenzweig@gebsc.com
         735 N Water St # 1400
         Milwaukee, WI 53202-4106
         Telephone: (414) 908-0242
         Facsimile: (414) 273-3821
         Attorneys for Defendants